## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CARLOS POREE** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO: 12-1068** |
| **KANDY KOLLINS, CEO,** | * | **SECTION: "N"(3)** |
| **EASTERN LOUISIANA MENTAL** | | |
| **HEALTH SYSTEM** | | |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to Title 28, United States Code, Sections 636(b)(1)(B) and (C), and, as applicable, Rule 8(b) of the Rules Governing Section 2254 cases. Upon review of the entire record,[1] the Court has determined that this

---

[1] Due to the age of this case, the State was unable to obtain the complete record of Poree's direct appeal to the Louisiana Supreme Court following his 1978 conviction. However, the reported cases and documents submitted are sufficient for resolution of the claim raised in Poree's petition.

matter can be disposed of without an evidentiary hearing.[2]  For the following reasons, it is hereby recommended that the instant petition be **DENIED.**

I.     FACTUAL AND PROCEDURAL HISTORY

Petitioner, Carlos Poree, is a state insanity acquittee currently committed to the Eastern Louisiana Mental Health System's ("ELMHS") Forensic Division in Jackson, Louisiana. The facts leading up to his commitment are as follows:[3]

On November 7, 1977, Poree shot ten people, killing one.  Among his victims were his estranged wife, her father, and various persons unknown to him who were shot on the streets of New Orleans and in the offices of a stock brokerage firm. Poree entered pleas of not guilty and not guilty by reason of insanity to the indictment for first degree murder, in Orleans Parish Criminal District Court, Case No. 262-289, Div. "H". A sanity commission found him incompetent to stand trial, and he was transferred to the East Louisiana State Mental Hospital for observation and evaluation. Five months later, after a course of psychotropic medication, Poree was determined legally competent to stand trial.

---

[2]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(I), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

[3]The facts are partially adopted from the federal district court opinion granting federal habeas relief in *Poree v. Cain*, 1999 WL 518843 (E.D. La. 1999).

2

Poree's first trial ended in a mistrial. His second trial proceeded on November 15 and 16, 1978.  All of the facts were stipulated so that the sole issue for the jury was whether Poree was not guilty by reason of insanity at the time of the offense. After hearing expert and lay witnesses on the sanity issue, the jury convicted Poree of first degree murder under La. Rev. Stat. § 14:30.[4]  In accordance with the jury's verdict, the trial court sentenced Poree to life imprisonment without benefit of parole, probation, or suspension of sentence on January 3, 1979.[5]

On appeal to the Louisiana Supreme Court, Poree challenged the sufficiency of the evidence supporting the jury's verdict rejecting his defense of not guilty by reason of insanity. The court reversed Poree's conviction and sentence, *State v. Poree*, 386 So.2d 1331 (La. 1980), but on application for rehearing by the State, the court affirmed the conviction and sentence. *Id.* at 1340. Poree pursued and exhausted state post-conviction relief in the state courts on the ground that there was insufficient evidence to sustain the jury's verdict, but was unsuccessful.  In 1997, Poree sought relief on the same grounds, pursuant to 28 U.S.C. §2254, in this federal court.  Finding merit to the claim, on July 20, 1999, the federal district court granted habeas relief and ordered the State of Louisiana to accept Poree's plea of not guilty by reason of insanity (NGBRI) and further ordered that the state court conduct

---

[4]State Rec. vol. 1 of 6, Docket Master entries dated 11/15/78-11/16/78.

[5]State Rec. vol. 1 of 6, Docket Master entry dated 1/3/79.

a hearing, pursuant to La. Code Crim. P. art. 654, to determine whether Poree should be civilly committed pursuant to the insanity verdict. *Poree v. Cain*, 1999 WL 518843 at *8.

Poree was subsequently diagnosed as a paranoid schizophrenic and, after a civil commitment hearing was held in 1999, was committed to the custody of the ELMHS upon a finding that he was both mentally ill and dangerous. Between 2002 and 2011, the state trial court has held four panel review hearings regarding Poree's continued civil commitment but has rejected all requests for a transfer to a less-restrictive, transitional setting.[6]  The most recent lunacy hearing occurred on January 18,  2011[7] but, despite the forensic review panel and the court's appointed psychiatric experts' recommendation that Poree be transferred to Harmony Transitional Center (hereinafter Harmony House), a private, residential transitional facility in Baton Rouge, the trial court denied Poree's request for a transfer on the basis that he still suffered from mental illness and posed a risk of danger if released from the custody of ELMHS.  It is this state trial court decision which is the subject of Poree's current §2254 challenge.

Poree timely appealed the trial court's ruling to the Louisiana Fourth Circuit Court of Appeal,  and the court, finding no abuse of the trial court's discretion, upheld the decision.

---

[6]State Rec. vol. 5 of 6, Transcript of Lunacy Hearing dated 10/19/02 at pp. 18-19; State Rec. vol. 1 of 6, Transcript of Lunacy Hearing dated 10/18/07 at pp. 12-13; Transcript of Lunacy Hearing dated 6/23/09 at pp. 26-27; State Rec. vol. 6 of 6, Transcript of Lunacy Hearing dated 11/18/11.

[7]State Rec. vol. 6 of 6, Transcript of Lunacy Hearing dated 1/18/11 (hereinafter Transcript).

*State v. Poree*, Writ No. 2011-K-0344 (La. App. 4th Cir., 6/23/11).[8] He also timely filed a request for a supervisory writ in the Louisiana Supreme Court but said writ was denied on October 7, 2011. *State v. Poree*, 71 So.3d 323 (La. 10/7/11).[9]

Poree, through counsel, filed the instant federal habeas petition in this Court on April 26, 2012.[10] The State concedes that the federal petition is timely filed and the record supports the same.[11] Additionally, a person who is confined in mental institution as a result of a judgment of not guilty by reason of insanity or as a result of any other judicial or administrative order is "in custody" for purposes of § 2254. See, e.g., *Flowers v. Leean*, 215 F.3d 1331 (7th Cir. 2000)(Text in Westlaw), (citing 1 James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure §8.2(d) at 341 (3d ed. 1998)). Moreover, although this is Poree's second federal habeas petition, he is not required to seek U.S. Fifth Circuit authorization to file it pursuant to 28 U.S.C. §2244(b) because the petition attacks a new judgment, *i.e.,* the trial court's 2011 denial of his request for transfer. *Magwood v. Patterson*, __ U.S. __, __, 130 S.Ct. 2788, 2801 (2010). Accordingly, the Court finds and the State concedes that the petition is not successive.

---

[8]State Rec. vol. 6 of 6 contains a copy of this decision.

[9]State Rec. vol. 6 of 6 contains a copy of this decision.

[10]Fed. Rec. Doc. 1.

[11]Fed. Rec. Doc. 13 at p. 12.

Poree's sole claim raised in his federal habeas petition is that the state trial court's 2011 decision to deny his conditional transfer to a transitional, less-restrictive environment violates due process and is contrary to or an unreasonable application of United States Supreme Court law. The State concedes that Poree exhausted this claim by presenting it to the state's highest court in *State v. Poree*, 71 So.3d 323 (La. 10/7/11)[12].

II.   EVIDENCE OFFERED AT THE JANUARY 18, 2011 LUNACY HEARING

The state trial judge held a lunacy hearing on January 18, 2011, during which the following witnesses testified on Poree's behalf: Dr. Franklin Bordenave, Poree's treating physician and board-certified forensic psychiatrist; Dr. John Thompson, Jr., Chief of Staff at ELMHS and board-certified forensic psychiatrist, and Mr. Ralph Griffin, Manager of Harmony House. Drs. Bordenave and Thompson were members of Poree's 2011 Forensic Review Panel. Also testifying were Drs. Richard Richoux and Raphael Salcedo, who comprised the court-appointed sanity commission.[13] It was stipulated that each of the doctors were experts in the field of forensic psychiatry, with the exception of Dr. Salcedo, who was an expert in forensic psychology.[14]

---

[12]A copy of this decision is located in State Rec. vol. 6 of 6.

[13]State Rec. vol. 6 of 6, Transcript at p. 2.

[14]Transcript at pp. 6, 28, 55, and 67.

6

Dr. Bordenave, the head of Poree's treatment team at ELMHS, reported that he meets with Poree on at least a monthly basis and sometimes more frequently.  He stated that Poree was "doing well" and has been in a state of remission from schizophrenia for many years. His schizophrenia, however, cannot be cured. Poree participates in group, recreational and work therapies.  He is also given an anti-psychotic medication (an injectionable form of Risperdal) once every 14 days and the medication remains in his system for up to 5 weeks. He is always compliant with taking his medication and his compliance is easy to monitor. If he were to stop taking his medication, he would likely decompensate and possibly become violent.  Dr. Bordenave reported that there was no evidence that Poree had delusions, auditory or visual hallucinations or other symptoms of schizophrenia. Although Dr. Bordenave has never witnessed any inappropriate smiling or laughing from Poree, some nurses had reported that he smiles on their unit. When questioned, Poree explained that he is smiling while watching television.  Dr. Bordenave reported that Poree's thoughts were organized and logical and he had good insight into his illness as well as his need for continued medication. Poree also understands the crimes which he committed and has accepted responsibility for his crimes.  Dr. Bordenave opined that Poree recognizes the early warning signs that his illness is resurfacing and would seek help from a nurse or mental health staff member if he began having symptoms. Dr. Bordenave testified that the conclusion of the Forensic Review Panel, after full examination, was that Poree's mental

7

illness was in full remission, he had achieved the maximum level of recovery and that he was not a danger to himself or others. Dr. Bordenave indicated that the state had a "significant continuity of care procedure" and had successfully transitioned other patients to Harmony House who were similar to Poree as well as many who were far more symptomatic.  He agreed that Harmony House had the structure and support necessary to successfully continue to treat Poree in its facility. At Harmony House, Dr. Bordenave explained, Poree would initially have few privileges and be placed in a locked unit with cameras on the doors.  As he made progress, Poree could be given additional privileges.  Dr. Bordenave confirmed that Harmony House is a transitional facility but patients are transferred there with the ultimate goal of someday being released into the community.  Based upon the foregoing, Dr. Bordenave and the other members of the Forensic Review Panel, recommended that Poree be conditionally released to Harmony House.[15]

Dr. Thompson, Chief of Staff at ELMHS and a member of Poree's Forensic Review Panel, testified that he had been working with Poree since his arrival at ELMHS in 1999.  He agreed with Dr. Bordenave's general assessment of Poree's condition and reported that Poree has achieved all of the treatment goals and objectives set for him, such as accepting his diagnosis, accepting the treatment offered to him for his illness, being willing to comply with the recommendations made by his treatment team, interacting in an appropriate manner with

---

[15]State Rec. vol. 6 of 6, Transcript at pp. 6-25.

other individuals, and exhibiting readiness to move to a group home or community setting.
He explained that Poree is in the least restrictive unit at ELMHS, one generally reserved for
patients ready to be discharged.  Dr. Thompson indicated that the Review Panel utilizes
several different tests or instruments[16] to evaluate a patient's mental illness and readiness for
community placement.  Poree's scores were "excellent".  On the COT readiness profile, he
scored a "20" and the panel considers individuals with a score of "34 or less" for community
placement. He stated that Poree's recommendation for placement at Harmony House is "the
safest recommendation" the panel can make. Dr. Thompson agreed with Dr. Bordenave that
Poree has reached his maximum forensic benefit, has matured, has shown no proclivity for
violence, can compromise and work well with others and shows good decision-making
abilities and judgment.  With regard to whether Poree shows some inappropriate laughter or
smiling, Dr. Thompson said Poree is a "happy go lucky" guy. Despite the seriousness of his
crimes, Poree has explained that he sometimes smiles as he has a hard time believing he
could have "done something like that".  Dr. Thompson indicated the smiling/laughter could
be a residual symptom or it could occur for the reasons explained by Poree. In his opinion,
Poree would comply with all conditions specified for his treatment if conditionally released
to Harmony House. He could also remain at Harmony House as long as needed and may
remain there indefinitely if unable to be released into the community. Staying in his present

---

[16]A "COT readiness profile", a "BPRS" rating instrument and "Hare's Psychopathies" were
specifically mentioned.

setting at ELMHS would not necessarily be a detriment, Dr. Thompson reported, but moving him to Harmony House would be the most appropriate placement.[17] Dr. Thompson did agree that there have been instances where medications just stop working and the patient can decompensate and have a psychotic episode but that is usually something seen with a patient taking oral medications on an outpatient basis. Additionally, with regard to delusions, Dr. Thompson stated that Poree is not reporting any and behaviorally none have been witnessed in his interactions with others. Finally, Dr. Thompson stated that, in his opinion, Poree is mentally ill but is not a danger to himself or to others if placed in the supervised setting at Harmony House.[18]

Mr. Ralph Griffin, Harmony House facility manager, also testified that he had interviewed Poree for possible placement at Harmony House and had pre-accepted him. Poree's pre-acceptance is based upon his insight into his illness, his understanding and remorse for his crimes, his stability over a significant period of time, his lack of aggression, and his consistency in taking his medication. According to Griffin's testimony, Harmony House houses 85 mentally ill individuals who are supervised by a staff of 24. It is a secure facility with magnetic locks controlled by staff, and is supervised on a 24-hour basis. Staff members receive 60 hours of training per year in behavioral management, including how to

---

[17]On cross-exam, Dr. Thompson explained that any "detriment" would be to Mr. Poree, who "should be able to move to the next setting" if he's not dangerous in his present setting.

[18]State Rec. vol. 6 of 6, Transcript at pp. 29-46.

identify warning signs of mental illness and recognize symptoms of decompensation. Approximately 80 percent of Harmony House's residents suffer from schizophrenia. Medication given by injection is either given by a psychiatrist on duty or by Baton Rouge Mental Health.  In the latter situation, Harmony House staff bring residents to Baton Rouge Mental Health and, once the medication is administered, a physician certifies that it was given. In the event of a re-emergence of symptoms by Poree, the staff would either be notified by Poree himself or the symptoms would be recognized by trained staff members who would then contact Poree's treating psychiatrist at Baton Rouge Health or a facility psychiatrist. He would then be evaluated to determine if he should be committed on an emergency basis to a short-term hospital or sent back to the forensic facility for stabilization. Residents at Harmony House can stay for up to five years and then be extended in additional yearly increments by the court.  Mr. Griffin indicated that, based upon his interview and the information he reviewed, he is confident Poree would be a successful resident at Harmony House.[19]

The court also heard testimony from Dr. Richoux, and it was stipulated that if Dr. Salcedo had testified, his testimony would be substantially the same as Dr. Richoux's.[20] Drs. Richoux and Salcedo met with Poree on the date of the hearing to update their impressions

---

[19]State Rec. vol. 6 of 6,Transcript at pp. 47-53.

[20]State Rec. vol. 6 of 6, Transcript at p. 66-67.

of Poree's condition so they could give an opinion to the court regarding whether they were in agreement with the recommendation of the ELMHS Forensic Review Panel. Dr. Richoux testified that between 1999 and the present, he had probably met with Poree ten times, more often in recent years. He reported that Poree has a long standing diagnosis of schizophrenia and has "excellent stabilization" of his symptoms on the long acting injectable antipsychotic drug, Risperdal.  Dr. Richoux indicated that if one was unfamiliar with Poree's history, he would have no detectable symptoms of schizophrenia. Although Poree initially had a problem understanding his illness, he presently has excellent insight and understands that if he stopped taking medication, he would have a high likelihood of relapse with a high risk of re-emergence of violent behavior. Dr. Richoux indicated, however, that since Poree is 68 years old, it would be normal that his propensity for violence may have decreased.  It is also possible (though not a frequent occurrence) that even on medication, a person who has been well-stabilized for a long time could show a breakthrough of psychotic symptoms.[21] According to Dr. Richoux, Poree is "about as well stabilized as a person can be who suffers from a major mental illness."[22]

At the conclusion of Dr. Richoux's testimony, the court expressed concern that if Poree is removed from the stable, homogenous hospital setting where he is currently housed

---

[21]State Rec. vol. 6 of 6, Transcript at pp. 55-62.

[22]State Rec. vol. 6 of 6, Transcript at p. 59.

to transition to Harmony House, then he might be exposed to the type of stimuli that prompted his violent behavior in 1977.[23] Dr. Richoux responded that, while there is always a chance of relapse, those with schizophrenia are not particularly sensitive to external stress. However, those with schizophrenia could become symptomatic even in a calm, serene environment. Dr. Richoux then pointed out, for the court's consideration, that Harmony House has other options available instead of a full release into the community upon an individual's completion of the program.  For example, Harmony House has supervised apartments where individuals who have successfully passed through their program can be housed and visited by staff, while still under the auspices of the court.[24]

Prior to making a ruling, the court recited at length the facts of Poree's 1977 crime and then indicated that the backdrop of Poree's prior crime and violent acts must always be considered in any decision by the court.[25]  Since it was not contested that Poree still suffers from a major mental illness, the court considered the question of whether the State had shown by clear and convincing evidence that Poree was a danger to himself or to others and concluded that it had.

The state district judge ruled, in pertinent part, as follows:

---

[23]State Rec. vol. 6 of 6, Transcript at pp. 62-63.

[24]State Rec. vol. 6 of 6, Transcript at p. 64-66.

[25]State Rec. vol. 6 of 6, Transcript at pp. 72-74.

The court respects the opinion of all the doctors that have testified in this case . . . However, this Court is in a position, again to protect the public from those cases where the Court's opinion being that the hospital is trying to transition Mr. Poree to his eventual release.  And this Court is not, and has not in the past, been satisfied that Mr. Poree does not present a potential for both danger to himself and to others.

The court finds that the danger is inherent in the activity and the conduct that occurred in 1977 and the months, and even years, preceding the manifestation of the illness by the shooting of ten people and the killing of one . . . . .

This is not a normal case.  This is not a case that calls into mind the countless other NGBRI cases that this Court has had.  And that is quite simply because the catastrophic and grievously injurious behavior that Mr. Poree wreaked on the community back in 1977.

Just because, as Dr. Richoux said, the symptoms are not manifesting and someone is asymptomatic, that does not negate the diagnosis. And, in this Court's opinion, does not negate the potential that Mr. Poree, should he transition into a less restrictive setting, would not manifest or relapse into the delusions and/or the behavior that presented itself through the years.

Also, the Court takes into account that the defendant has done well in the environment that he is in, which is a stabilized, homogenous type environment with no external stimuli, [there is] no litmus test for this Court to use as to whether or not he would decompensate if he is placed in a less restrictive setting.

The law doesn't say that once a defendant reaches maximum benefit that he must be released.

The law says if the defendant still has a major, mental illness and presents as a potential danger to himself or to others – and that's been proven by clear and convincing evidence – the Court may maintain its continued confinement of Mr. Poree . . . . .

14

And therefore, the Court declines to transition Mr. Poree to the Harmony House facility, maintains his confinement at the Eastern Louisiana Mental Health facility, forensic side. And set this for an annual review.[26]

III.   <u>STANDARDS OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments modified a federal habeas court's role in reviewing state court judgments "to ensure a level of 'deference' to the determinations of the state courts, provided those determinations did not conflict with federal law or apply federal law in an unreasonable way." *Williams v. Taylor*, 529 U.S. 362, 386 (2000). Within the context of reviewing a state insanity acquittee's challenge to his continuing commitment, the statute applies to "any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C.§2254(d), and AEDPA thus requires the same deference be given in this case as is given to a state judgment of conviction.  See *Francis S. v. Stone*, 221 F.3d 100, 108 n.10 (2nd Cir. 2000).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

---

[26]State Rec. vol. 6 of 6, Transcript at pp. 75-78.

28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.")

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1) ] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

*Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694; see also *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), *cert. denied*, —— U.S. ——, 132 S.Ct. 1537 (2012).  To make a showing that the state court judgment was objectively unreasonable, a petitioner must prove that the judgment "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, __ U.S. __,__, 131 S.Ct. 770, 787 (2011).

IV.     LAW APPLICABLE TO INSANITY ACQUITTEES

The United States Supreme Court has repeatedly recognized that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones v. United States*, 463 U.S. 354 (1983).  See also, *Addington v. Texas*, 441 U.S. 418 (1979); *Jackson v. Indiana*, 406 U.S. 715 (1972); *Humphrey v. Cady*, 405 U.S. 504 (1972); *In re Gault*, 387 U.S. 1 (1967); *Specht v. Patterson*, 386 U.S. 605 (1967).  In addition, due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed.  *Jones,* 463 U.S. at 368. Since Poree was found not guilty by reason of insanity, the purpose of his continued commitment cannot be to punish him for his 1997 conduct.  See *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).  "The purpose of commitment following an insanity acquittal, like that of a civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness." *Jones*, 463 U.S. at 368.

In *Addington v. Texas*, the Supreme Court ruled that due process entitles a person involuntarily committed to a state psychiatric facility to be released unless the state shows by "clear and convincing evidence" that the individual is both mentally ill and dangerous. 441 U.S. at 443.  The Court subsequently applied *Addington* to the initial civil commitment of a state insanity acquittee in *Jones v. United States*, 463 U.S. at 370,[27] and  to the

---

[27]The Court allowed for a preponderance of evidence standard rather than "clear and convincing evidence" for the initial commitment of an insanity acquittee since the *acquittee himself*

continuing civil commitment of an insanity acquittee in *Foucha v. Louisiana*, 504 U.S. at 77 ("[t]he committee acquittee is entitled to release when he has recovered his sanity or is no longer dangerous.") *Foucha* affirmed that the burden rests with the state to establish mental illness and dangerousness by "clear and convincing evidence." *Foucha*, 504 U.S. at 80.[28]

The Supreme Court has also recognized that different considerations underlie the commitment of insanity acquittees, holding that "insanity acquittees constitute a special class that should be treated differently from other candidates for commitment." *Jones*, 463 U.S. 370. For example, "the fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Id.* at 364 (citing *Lynch v. Overholser*, 369 U.S. 705, 714 (1962)(that the accused was found to have committed a criminal act is "strong evidence that his continued liberty could imperil 'the preservation of the peace' "). The Court has also indicated that concrete evidence that an individual committed a crime is "at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding." *Jones*, 463 U.S. at 364-65.

Additionally, the U.S. Fifth Circuit has indicated that, although insanity acquittees are entitled to substantially the same procedural protections afforded civil committees, insanity

---

had already advanced and proven insanity as a defense to criminal charges. *Jones*, 463 U.S. at 367.

[28]Louisiana law likewise provides that the burden is on the State to seek continuance of the confinement of an insanity acquittee by a showing that the committed person is both mentally ill and dangerous, by clear and convincing evidence. See La. Code. Crim. P. art. 657.

acquittees can be viewed differently when being considered for release since the "prior anti-social conduct of an insanity acquittee justifies treating such a person differently . . ." *Powell v. Florida*, 579 F.2d 324, 333 (5th Cir. 1978).  See also, *Warren v. Harvey*, 632 F.2d 925, 931 (2nd Cir. 1980)(that insanity acquittees have been found, beyond a reasonable doubt, to have committed a criminal act indicates they have "proved themselves a danger to society at one time").

With regard to whether an insanity acquittee remains mentally ill and dangerous, the determination of mental illness is "strictly a medical judgment that the judge can render only with the assistance of expert medical knowledge." *Powell*, 579 F.2d at 332. Therefore, a judge cannot reject unanimous medical opinion that the insanity acquittee is not mentally ill. *Id.*   Whether an insanity acquittee is dangerous at the time he seeks release from commitment, however, involves "both a legal and social judgment, as well as a medical opinion".  *Id.* at 333.   The purpose of this requirement is to assure that only those whose potential for doing harm is great enough to justify the deprivation of their liberty are committed.  *Powell*, 579 F.2d at 333 (citing *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)). "[D]angerousness is a determination that does not lie solely within the province of medical opinion; 'a state may reasonably allow the judge to play a greater role in making this determination . . . than he plays in other civil commitment cases.' " *Jackson v. Foti*, 670 F.2d 516, 522 (5th Cir. 1982).

V.    <u>ANALYSIS</u>

Poree, through counsel, contends that the state court's judgment, based upon a finding of both mental illness and dangerousness, and denying his transfer to Harmony House, is contrary to or an unreasonable application of clearly establish federal law, as announced in the Supreme Court cases of *Foucha* and *Jones*, *supra*. Not contested is that the evidence overwhelmingly supports the state district judge's determination that Poree is mentally ill as he has a "longstanding diagnosis of schizophrenia" which "cannot be cured".[29] In contention, however, is the state court's determination that Poree is a potential danger to himself or others.  Specifically, Poree argues that the state court's determination of dangerousness was contrary to federal law in two primary respects: 1) that the state court relied on potential or future dangerousness rather than current dangerousness; and,  2) that the state court based its finding of dangerousness on Poree's past crimes and mental illness.

---

[29]State Rec. vol. 6 of 6, Transcript at pp. 15 and 57.

### A. *Potential versus current dangerousness*

First, it is argued that the state district judge erroneously made its determination based upon the *potential* danger that Poree's transfer to Harmony House could pose. Poree claims that both *Foucha* and *Jones* require a showing that Poree is mentally ill and *currently* dangerous for his confinement to continue. Arguing that all the evidence offered at the January 18, 2011 lunacy hearing established that Poree is not currently dangerous, Poree asserts that *Foucha* and *Jones* require that he be transferred to Harmony House.

In *Foucha*, the United States Supreme Court struck down a Louisiana statute that permitted the state to confine insanity acquittees in a mental health facility for an indefinite duration based on a finding of "dangerousness" alone. The State had conceded that Foucha was no longer suffering from a mental illness but the doctors who comprised the two-member sanity commission refused to certify that Foucha would not constitute a menace to himself or others if released. As a result, the court ruled that Foucha was dangerous to himself and others and, in accordance with the Louisiana statute then in place, ordered him returned to the mental institution. After the state supreme court affirmed, the United States Supreme Court granted certiorari. The Court then held, by a majority, that the Louisiana statute, which allowed continued confinement based upon a showing of dangerousness alone, violated the Due Process Clause of the Fourteenth Amendment. *Foucha*, 504 U.S. at 80.[30]

---

[30]A plurality of the Court also concluded that the statute violated the Equal Protection Clause.

The State argues that Poree's reliance on *Foucha* as "clearly established Federal law" pursuant to §2254(d)(1) is misplaced because any reference to the "dangerousness prong" in *Foucha* is merely dicta.[31] The state emphasizes that, "[T]he real significance of the [*Foucha*] holding is that unless an acquittee has an identifiable mental condition, he cannot be held by the state merely because he is dangerous," citing *Parrish v. Colorado*, 78 F.3d 1473, 1477 (10th Cir. 1996).[32]

The state's point is well taken. *Foucha* is clearly factually distinguishable from Poree's case because Poree continues to suffer from a mental disease or illness. A careful review of the *Foucha* decision makes clear that the Supreme Court was primarily concerned that the form of Foucha's confinement had ceased to be appropriate. The Court stated that because Foucha was no longer mentally ill, "the basis for holding [him] in a psychiatric facility as an insanity acquittee ... disappeared." *Foucha*, 504 U.S. at 78. The Court further stated that, "if [Foucha] is to be held, he should not be held as a mentally ill person." However, with regard to the specific issue of dangerousness, the *Foucha* decision itself sheds no light whatsoever on the nature of the evidence that could reasonably be relied upon by a state judge in determining dangerousness or whether current dangerousness rather than future

---

[31]Clearly established Supreme Court law "refers to the holdings, as opposed to the dicta", of Supreme Court decisions as of the time of the relevant state-court decision. *Lockyear v. Andrade*, 538 U.S. 63, 71 (2003).

[32]Fed. Rec. Doc. 13 at p. 22.

or potential dangerousness need be shown.  In fact, the review panel in *Foucha* made no express finding of dangerousness.  *Id.* at 75 n.2.

*Jones* similarly does not address the issue of whether future or potential dangerousness can be considered rather than current dangerousness. The issue in *Jones* was whether an individual who was committed to a mental hospital upon being acquitted of a criminal offense by reason of insanity, must be released because he had been hospitalized for a period longer than he might have served in prison had he been convicted. 464 U.S. at 356.[33] In fact, the Supreme Court specifically indicated that it was <u>not</u> reviewing the determination itself that Jones was mentally ill or dangerous. *Id.* at 363 n. 11.  Thus, the fact that the state court relied on potential or future dangerousness in its decision cannot be shown to be contrary to or an unreasonable application of Supreme Court law as set forth in *Jones*.

Moreover, it is notable that *Jones* did discuss dangerousness in terms of whether it could be "predicted", which indicates to this Court that future dangerousness was not off-limits for any release consideration. See *Jones*, 463 U.S. at 364 ("concrete evidence [of a crime] generally may be at least as persuasive as an *predictions* about dangerousness that might be made . . . "); *Id.* at 365 n. 13 (discussing the "predictive value" of  prior dangerous

---

[33]The Supreme Court also held in *Jones* that an insanity acquittee may be initially committed upon the State's proof of present mental illness and dangerousness by the less stringent preponderance of the evidence standard.  463 U.S. at 368.

acts); and, *Id.* at 368 ("The purpose of commitment ....is to treat the individual's mental illness and protect him and society from his *potential* dangerousness.")

Additionally, the Louisiana statute which deals with the discharge or release of insanity acquittees is La. Code. Crim. P. art. 657.  Art. 657 provides that, after the court has considered the reports of the forensic review panel and evaluating physicians, the court may either continue the commitment or hold a contradictory hearing to determine whether the committed person is no longer mentally ill and can be discharged, or can be released on probation, without danger to others or himself as defined by La. Rev. Stat. 28:2(3) and (4). La. Rev. Stat. 28:2(3) defines "dangerous to others" as "the condition of a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person *in the near future*" (emphasis added). Since nothing in either *Foucha* or *Jones* is contrary to the requirements of Art. 657, the state district court acted within its authority in considering future or potential dangerousness when it denied Poree's request for transfer and her consideration of future dangerousness cannot be said to be contrary to Supreme Court precedent.

B.  *Consideration of Past Criminal Acts and Mental Illness*

Next, Poree argues that the state district judge erroneously disregarded "all of the evidence presented at the review hearing" and based her decision on the facts of Poree's original criminal offense and the fact that he has an incurable mental illness. Poree cites to

*Jones* for the principle that any determination of "dangerousness" should be based in significant part on the evidence presented at the release hearings – "evidence independent of his acquittal by reason of insanity of the [underlying crime[.]"[34]  He argues that the state district judge's consideration of the facts of Poree's crimes in 1977 was in direct opposition to Supreme Court precedent in *Jones* and thus is clearly contrary to or an unreasonable application of federal law.[35]

Poree relies on a small extract from one line in the *Jones* decision in support of this argument.  To understand *Jones'* discussion, however, the Court cites the entire passage and reviews it in context, *to wit*:

> "The relative "dangerousness" of a particular individual, of course, should be a consideration at the release hearings.  In this context, it is noteworthy that petitioner's continuing commitment may well rest in significant part on evidence independent of his acquittal by reason of insanity of the crime of attempted larceny."

The Court was discussing Jones' argument that, because the crime which triggered his commitment  was petty larceny rather than a violent crime, he should not have been found "dangerous" for purposes of his initial civil commitment following his adjudication as not guilty by reason of insanity.  After noting that even crimes of theft frequently may result in violence, the Court stated that Jones' continuing commitment may well rest on other evidence

---

[34]Fed. Rec. Doc. 1 at p. 22.

[35]Fed. Doc. 1 at p. 17.

that was submitted at his release hearing, independent of his acquittal by reason of insanity, such as his history of attempted suicide, his disruptive behavior in the forensic division and his dangerous behavior that resulted in an emergency re-commitment.  *Id.* at 365 n. 14. Thus the language in *Jones* was applicable *to that specific case* where the underlying act which subjected Jones to commitment was challenged as not being violent.

This Court does not read  *Jones* to say it is *impermissible* for the state judge to have considered the facts of the triggering offense *as well as other evidence of dangerousness* offered at a release hearing. In fact, *Jones* specifically condones the consideration of the underlying criminal act in a determination of dangerousness. "The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Id.* at 364.  See also, *Jackson v. Foti*, 670 F.2d at 522 ("In view of Jackson's anti-social act of homicide, the state trial judge was entitled, on this record, to find Jackson to be dangerous"); *Powell v. Florida*, 579 F.2d at 333 (dangerousness to society has already been established by jury's finding of anti-social behavior, the killing of another human being); *Warren v. Harvey*, 632 F.2d 925, 934 (2nd Cir. 1980)(although insanity acquittal did not constitute dispositive proof of present dangerousness, it was substantial evidence that insanity acquittee remained a danger to society); *Benham v. Ledbetter*, 785 F.2d 1480 (11th Cir. 1986)(a finding beyond a reasonable doubt that a person committed a crime indicates dangerousness) and, *Hartman v. Summers*, 878 F.Supp. 1335 (C.D. Calif. 1995)(not

unreasonable that legislature determined than an insanity acquittal supports an inference of continuing mental illness and dangerousness.)

However, this is not to say that the state district judge could rely on Poree's past criminal conduct *alone* in making a finding of dangerousness. When considering the release of an individual committed by reason of insanity, the court should also properly look to that individual's behavior *since the crime* to determine whether or not his recent behavior demonstrates his continuing dangerousness. See e.g., *Canidate v. Reddoch*, 2006 WL 2480062 *6 (M.D. Ala. 8/25/06)(emphasis added). Although Poree argues that "no other evidence" was presented at the lunacy hearing to establish by clear and convincing evidence that he was dangerous, a balanced review of the transcript from that hearing indicates that is not correct. Dr. Bordenave testified that Poree's schizophrenia cannot be cured.[36] As a result, if Poree were to discontinue his medication, he will likely decompensate and possibly become violent.[37] There was some evidence that Poree has been seen smiling or laughing inappropriately, a symptom Dr. Thompson reported could be residual from his mental illness.[38] Dr. Thompson also testified that there have been instances where the medications given to schizophrenic patients have just stopped working, resulting in the decompensation

---

[36]State Rec. vol. 6 of 6, Transcript at p. 15.

[37]State Rec. vol. 6 of 6, Transcript at pp. 10, 15-16.

[38]State Rec. vol. 6 of 6, Transcript at p. 16, 41.

of a patient.[39]  Dr. Richoux recognized that a patient such as Poree, with a long-standing diagnosis of schizophrenia, could have a high likelihood of relapse with a corresponding high risk of violent behavior.[40] Dr. Richoux also stated that there is "always a chance of relapse" and the possibility of a breakthrough of schizophrenic symptoms even while taking medication.[41] Such evidence, *along with Poree's previous violent history that led up to his commitment*, his ongoing mental illness and the uncertainty of how a change in his currently structured environment could affect him, supports, by clear and convincing evidence, the state district judge's determination that Poree should not be released to Harmony House.

This Court is not unsympathetic to Poree's situation as it appears that he has done all that was asked of him to meet his treatment goals.  If this Court were independently reviewing the evidence submitted at the 2011 hearing, it might conclude differently than the state district court because a significant amount of evidence favorable to Poree was submitted at the lunacy hearing in 2011.   For example, Poree's schizophrenia has been in a state of remission for years,[42] he is compliant with taking his medication and it is apparently working for him[43], he has insight into his mental illness and acknowledges that he must remain on

---

[39]State Rec. vol. 6 of 6, Transcript at p. 43-44.

[40]State Rec. vol. 6 of 6, Transcript at pp. 37, 60-61.

[41]State Rec. vol. 6 of 6, Transcript at pp. 58, 60-61, 63.

[42]State Rec. vol. 6 of 6, Transcript at pp. 13, 15.

[43]State Rec. vol. 6 of 6, Transcript at p. 42.

medication for life,[44] and, importantly, he has shown no proclivity for violence.[45] Additionally, he requests only a transfer to Harmony House, an apparently secure and monitored facility, and not full release into the community at large. However, this federal habeas court cannot find that the state court has engaged in an unreasonable application of Supreme Court law "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. The role of a federal habeas court is limited to the question of whether the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Poree cannot show the state court decision was "objectively unreasonable" and therefore fails to meet this burden.

That said, one of the ramifications of the foregoing analysis is that it may well insulate these types of cases from meaningful *habeas corpus* review. That is particularly troubling to this Court for the following reasons.

Although this Court has no doubt that the state court judge in the instant case acted honorably,[46] these types of cases will *in general* present elected state court judges with a

---

[44]State Rec. vol. 6 of 6, Transcript at pp. 9-10.

[45]State Rec. vol. 6 of 6, Transcript at p. 38.

[46]It is not this Court's intent to question the motivation behind the decision of State District Judge Camille Buras, who presided over Mr. Poree's lunacy hearings. In fact, Judge Buras is well-known to this Court and in this community as a respected jurist. Nothing in this Court's comments

practical dilemma.  A decision to grant *any* form of relief to a person who has committed a violent crime is rarely popular with the electorate, even where, as here, the person was in the throes of mental illness when the crime was committed.  As a result, it is not difficult to imagine that some judges may opt to routinely take the politically safer course of simply refusing to grant relief to an insanity acquittee unless it can be "guaranteed" that the past will not repeat itself.  However, when the insanity acquittee suffers from a type of mental illness which *cannot* be "cured," psychiatric experts will *never* be able to "guarantee" that he will not relapse.  Therefore, despite the fact that his mental illness may be in complete remission, and despite the fact that a continuum of less-restrictive mental health treatment options may exist which could adequately address his needs without posing an undue risk to the community, there is a very real possibility that such a person may effectively be precluded from receiving relief on the state level.

Federal *habeas corpus* relief should be available to remedy such a situation if it arises.  However, because the United States Supreme Court's jurisprudence does not clearly address much less support such a petitioner's claim, *habeas* relief must be denied because it cannot be said that the state court's ruling impermissibly ran afoul of "clearly established Federal law" for purposes of §2254(d)(1).  See Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in

---

should be construed as a challenge to the integrity of Judge Buras' particular decision rendered in this case.

[petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law.   Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized.").  If that is, indeed, the state of the law, this Court feels that an examination of this issue by a higher court would serve the interests of justice.

## RECOMMENDATION

Accordingly,

For the foregoing reasons, IT IS HEREBY RECOMMENDED that the instant petition for federal *habeas corpus* relief filed by Carlos Poree be DENIED.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(en banc). [47]

New Orleans, Louisiana, this 25th day of October, 2013.

---

[47]*Douglas* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE